1

2

3

4                        UNITED STATES DISTRICT COURT

5                       NORTHERN DISTRICT OF CALIFORNIA

6

7    BREWSTER DENYVEOUS PHELPS,          Case No.  22-cv-01729-JSC

8                Plaintiff,
                                         ORDER DENYING PETITION FOR
9         v.                             WRIT OF HABEAS CORPUS

10   GIGI MATTESON, et al.,

11              Defendants.

12                            **INTRODUCTION**

13          Petitioner Brewster Denyvous Phelps, a prisoner of the State of California proceeding

14   without representation by an attorney, filed a petition for a writ of habeas corpus seeking relief

15   from his state conviction.  The amended petition is the operative pleading.  (ECF No. 19).  Three

16   of the four claims have been dismissed, and the second claim asserting he received ineffective

17   assistance of counsel at trial remains.  (ECF No. 26 at 9:14-21.)  Respondent has filed an answer,

18   exhibits, and a supporting memorandum arguing the claim should be denied.  (ECF Nos. 27, 28,

19   31, 34.)  Petitioner has filed a traverse.  (ECF No. 33.)  For the reasons discussed below, the claim

20   is without merit, and the petition, as amended, is DENIED.

21                            **BACKGROUND**

22     1.  Procedural Background

23          In 2018, Petitioner was convicted in the Santa Clara County Superior Court of attempted

24   murder, assault with a firearm, and assault by means likely to produce great bodily injury.  (ECF

25   No. 34 at 216-22.)  Petitioner was sentenced to state prison for a term of 25 years to life

26   consecutive to 10 years.  (*Id.* at 233.)

27          In his remaining claim, Petitioner argues his counsel rendered ineffective assistance by

28   failing to call an expert on eyewitness identification.  (ECF No. 19 at 5-7 (claim two).)  Petitioner

*United States District Court*
*Northern District of California*

1    presented this claim to the California Court of Appeal in both a direct appeal and a petition for a

2    writ of habeas corpus.  (ECF. No. 28-9 at 33-41, 181-90.)  The California Court of Appeal denied

3    the appeal in a detailed opinion (*id.* at 105-16), and simultaneously denied the habeas petition in a

4    summary opinion (*id.* at 201).  Petitioner did not present this claim in his petition for direct review

5    to the California Supreme Court, but rather in a habeas petition that the California Supreme Court

6    denied summarily.  (*Id.* at 227-37, 251.)[1]

7        2.   Factual Background

8            The California Court of Appeal summarized the evidence at trial as follows:

9               Surveillance footage from the bar and the pizzeria [where the
     crimes took place] was admitted in evidence. The bar's surveillance
10   system consisted of six inside cameras plus cameras trained on the
     front and back entrances. Law enforcement extracted 20 minutes of
11   footage starting at 10:35 p.m., and the footage was admitted as
     People's Exhibits 1 and 2. The footage showed defendant and [Turo]
12   Collins[3] at 10:35 p.m. engaging the bartender and another patron
     in conversation. Collins was wearing [a] "star" cap and defendant
13   was wearing a distinctive "San Jose" inscribed white cap with a
     black bill. A female wearing a white tank top arrived within a few
14   minutes, and the three appear animated and jovial. The manager
     arrived a few seconds later. He greeted defendant, Collins, and the
15   female with handshakes and hugs, and he sat down at the bar next to
     the trio.
16
                The surveillance system also captured Richard[] and three
17   females socializing and playing pool in the rear of the bar with the
     victim (identified by a jersey he was wearing displaying the number
18   12 on the back) and a fourth female. The victim and his companion
     (the fourth female) exchanged goodbyes with Richard and his group
19   before leaving the bar at 10:47 p.m.

20              Police investigators did not extract the electronic footage of
     the shooting, which occurred inside the bar shortly after 11:00 p.m.
21   But the manager took two videos on his cell phone capturing the
     surveillance footage from different channels displayed on a monitor.
22   Those videos, which were shaky and of inferior quality compared to
     the electronic footage, were admitted as People's Exhibit 3. The
23   victim was shown in the first video entering the bar through the rear
     entrance. The victim appeared upset, and was speaking with Richard
24   when defendant entered the bar and fired his gun in the victim's
     direction. The second video captured the victim and Richard talking,
25   and defendant shooting his gun at the victim who ran out the front
     door. The second video also showed the victim on a different
26

27   _____
     [1] Petitioner filed two subsequent habeas petitions in the California Supreme Court, which
28   summarily denied them, but these petitions did not raise the claim at issue here.  (ECF No. 28-9 at
     276-295, 297, 299-320, 322.)

*United States District Court*
*Northern District of California*

channel running into the front parking lot followed by defendant.

The pizzeria had four outside security cameras. The front camera was trained on the walkway extending from the pizzeria to the bar, two cameras captured the back parking lot (one of which showed the back entrance to the bar), and a fourth camera monitored the side parking lot. Footage from that system starting at 11:00 p.m. was admitted as People's Exhibit 4. The footage showed a car drive into the back parking lot at 11:01 p.m. The victim (identified by his clothing) got out of the passenger side, entered the bar, and returned to the car with one of Richard's female companions who approached the driver's side window for what appears to be a brief conversation. The car drove away and returned to the same location about 90 seconds later, when the victim got out of the car a second time and walked around the building as the car left. The front walkway camera showed the victim step from the front walkway into the parking lot and out of the camera's view.

Thirty seconds later, the front walkway camera captured the female with the white tank top entering the bar from the front parking lot. A few seconds later, the female and defendant are seen leaving the bar and running toward the side parking lot. The victim was then captured on the side parking lot camera, as defendant, Collins, and the female chased him around the corner. The three overtook and beat the victim for nearly a minute with their fists and an object. The victim is then seen from the rear parking lot camera walking toward the bar, followed by the trio. As the victim entered the bar, Collins returned to the beating site where he picked up objects, and the female and defendant walked toward a car in the far corner of the rear parking lot. The female turned back and walked around the building where she joined Collins. The two walked toward a van in the front parking lot and out of the camera's view, as defendant walked from the car across the back parking lot and into the back of the bar. The front walkway camera captured the victim leaving the bar 15 seconds later, followed by defendant. The side building camera then showed defendant joining Collins and the victim, who had fallen. The female drove up in the van and briefly interacted with Collins and defendant. Defendant then returned to the bar, the female drove away, and Collins stayed with the victim. Twenty seconds later, the back parking lot camera captured defendant leaving the bar and driving away in the car. Collins stayed with the victim for another 90 seconds until another car arrived. He helped the victim into the car, and left the area on foot.

The manager testified that his girlfriend owned the bar, he was there to close for her that night, and he sat next to Collins, the female, and the man he later identified as defendant "until we were going to close the bar." He viewed People's Exhibits 1 and 2 (the bar's surveillance videos) and People's Exhibit 3 (the cell phone videos). He identified himself in the videos, testified that the surveillance videos accurately depicted what was happening in the bar before the shooting (even though "sometimes" the time stamp on the surveillance system was not accurate and did not hold when there was a power interruption), and that the shooting was accurately captured by the cell phone videos. He testified that the shooter and the man with the white hat in the surveillance videos were the same

3

person, and he identified that person in court as defendant. Richard testified that he was at the bar with his girlfriend, his goddaughter, and his goddaughter's friend when the shooting occurred. The victim entered the bar "bleeding all over the place"; he did not have a weapon; he may have been the same man Richard had been playing pool with earlier; and he was upset and asked Richard why he did not help him. Richard testified that "another individual" entered the bar, discharged a firearm, and the victim ran out the front. The shooter "kept shooting as he went through" the bar and out the front, and Richard was struck on the right side of his head with the gun's grip. Richard testified that the shooter came back through the front yelling " 'You didn't see nothing. You don't know nothing,' " and left out the back. Richard identified himself in the surveillance footage playing pool, and in both cell phone videos. He testified on cross-examination that the victim was in the bar before the shooting but he was not the man Richard had played pool with. On redirect he acknowledged telling the police that he and the victim had " ' 'just played a round of pool.' ' " Neither party asked Richard whether he could identify defendant as the shooter.

Richard's girlfriend testified that she was at the bar with Richard and two friends. She heard shots, was pushed to the floor by a friend, stayed there until "everything was over," and called the police. She testified that she did not see the shooter, did not remember seeing the shooter, and did not have her glasses on that night so "everything is just a blur." One of the friends testified that she was in the bar that night, but she was intoxicated and did not remember anything.

The victim testified that he remembered being at the bar at some point that night, but he had been drinking a lot, and "Everything is blurry. I don't remember much. You know, just bits and pieces of that day." He identified himself in both videos in People's Exhibit 3, and in photographs depicting his injuries at the hospital. But he did not remember "getting to the hospital or nothing." The night was "just a blur," and he did not recognize defendant as the man who shot him.

The victim's then-girlfriend testified she returned to the bar after receiving a call that there had been a shooting. She watched the pizzeria's surveillance video showing the victim getting into a car after the shooting, and recognized it as when she picked up the victim to take him to the hospital.

(ECF No. 28-9 at 106-10.)

## STANDARD OF REVIEW

Under the Anti-Terrorism and Effective Death Penalty Act (AEDPA), this Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

4

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id*. § 2254(d).

With respect to Section 2254(d)(1), "[u]nder the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). "Under the 'reasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. "[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id*. at 409. The only definitive source of "clearly established" federal law under 28 U.S.C. § 2254(d)(1) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. *Id*. at 412. While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Clark v. Murphy*, 331 F.3d 1062, 1070-71 (9th Cir. 2003).

Factual determinations by the state court are reviewed under 28 U.S.C. § 2254(d)(2) (quoted above) and 28 U.S.C. § 2254(e)(1) (requiring federal court to presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence). Section 2254(d)(2) applies to intrinsic review of a state court's process, or situations in which the petitioner challenges the state court's findings

1  based entirely on the state court record, whereas Section 2254(e)(1) applies to challenges based on

2  extrinsic evidence or evidence presented for the first time in federal court.  *Taylor v. Maddox*, 366

3  F.3d 992, 999-1000 (9th Cir. 2004).

**DISCUSSION**

5  1.  Petitioner's Claim

6  Petitioner claims trial counsel rendered ineffective assistance because he failed to call an

7  expert witness on the subject of eyewitness identification.  (ECF No. 19 at 5 (claim two).)

8  2.  State Court Opinion

9  A federal court reviewing a state court's decision under 28 U.S.C. § 2254(d), when

10  confronted with an unexplained decision from the last state court to have been presented with the

11  issue, "should 'look through' the unexplained decision to the last related state-court decision that

12  does provide a relevant rationale.  It should then presume that the unexplained decision adopted

13  the same reasoning." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018).  Here, the last state court to

14  have been presented with this claim was the California Supreme Court, which denied the claim in

15  an unexplained opinion.  (ECF No. 28-9 at 251.)  The last state court decision that provided a

16  rationale for denying the claim was the California Court of Appeal in its opinion denying the

17  claim on direct appeal:

18   Defendant argues that trial counsel rendered ineffective
19   assistance and deprived him of due process by failing to call an
   expert on eyewitness identification "to help the jury unpack the
20   complexity of cross-racial eyewitness identification."[2] Defendant
   argues that the manager's eyewitness identification of defendant
21   as the shooter was unreliable because "the only interaction [the
   manager] had with the shooter was the split second he had between
22   looking at the [victim] and hearing the first shot being fired"; the
   prosecution exerted pressure on the manager to testify; and as a
23   result of that pressure, his identification "was clouded and
   compromised by a vague understanding of the identity of the man

24  ─────────────

25  [2] The manager is Asian-American, and Petitioner is African-American.  In state court, Petitioner
   argued the cross-racial nature of the manager's identification was one reason trial counsel should
26  have called an identification expert.  (ECF No. 28-9 at 188:4-6; 190:4-6.)  Here, Petitioner does
   not make this argument, nor does he claim an expert was necessary to address cross-racial
27  identifications: the amended petition makes no reference to cross-racial identification (*see* ECF
   No. 19 at 5-7), and while the original petition made brief references to race (ECF No. 1 at 17:14,
28  19:8), it did not argue the identification was unreliable because it was cross-racial or that an expert
   was needed to address this issue (*see id.* at 5, 15-20).

Northern District of California
United States District Court

who fired shots in his bar."

An ineffective assistance claim requires a showing both that counsel's performance fell below an objective standard of reasonableness and that defendant was prejudiced by the deficient performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) "Unless a defendant establishes the contrary, we shall presume that 'counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.' " (*People v. Ledesma* (2006) 39 Cal.4th 641, 746.) If the record on appeal "sheds no light on why counsel acted or failed to act in the manner challenged, 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation' [citation], the case is affirmed [citation]." (*People v. Babbitt* (1988) 45 Cal.3d 660, 707.) To prove prejudice, a defendant must affirmatively show a reasonable probability of a more favorable result but for trial counsel's errors. (*Ledesma*, at p. 746.) A reasonable probability is "a probability sufficient to undermine confidence in the outcome." (*People v. Williams* (1997) 16 Cal.4th 153, 215.)[3]

Defendant inaccurately describes the record when he asserts that the manager's only interaction with the shooter was the split second in which he witnessed the shooter fire his first shot. At trial, the manager identified the shooter as the man with the white cap shown in the bar's surveillance video from earlier that evening. The prosecutor paused the second video on People's Exhibit 3 on an image of a person wielding a handgun and asked if that was the shooter. The manager responded, "I ran out of the door at the time he came in." The following colloquy ensued: "Q. All right. And you watched the surveillance video[,] right? [¶] A. Yeah. [¶] Q. You watched this video? [¶] A. Yeah. [¶] Q. And did you see the video of you earlier in the night at the bar? [¶] A. Yeah. [¶] Q. With the man with the white hat? [¶] A. Yeah. [¶] Q. Okay. Is that the same man? [¶] A. Yeah. [¶] Q. Okay. Do you see him in court today? [¶] A. Yeah." The manager then identified defendant.

The bar's surveillance video (People's Exhibits 1 and 2) shows 20 minutes of footage before the assault occurred. The manager is seen entering the bar about four minutes into the footage. After greeting other customers, the manager greeted defendant,

---

[3] The language and holdings of the state court decisions in this paragraph regarding Sixth Amendment claims of ineffective assistance of counsel mirror the United States Supreme Court decisions in *Strickland* and its progeny. *Cf. Strickland*, 466 U.S. at 689 (holding "[j]udicial scrutiny of counsel's performance must be highly deferential" and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance"); *id.* at 694 (holding to show prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different; a reasonable probability is a probability sufficient to undermine confidence in the outcome"); *Dunn v. Reeves*, 594 U.S. 731, 738 (2021) (per curiam) (holding "[t]he burden of rebutting th[e] presumption [of counsel's reasonableness] rests squarely on the defendant, and it should go without saying that the absence of evidence cannot overcome it") (internal quotations and citations omitted).

United States District Court
Northern District of California

Collins, and the female with handshakes and hugs, and he sat at the bar next to them for another 14 minutes. The trio conversed with the manager and the bartender, and the female took pictures on her phone, including at least two with Collins and the manager. Sixteen minutes into the footage, defendant sat down next to the manager and the two engaged in conversation. The manager also testified that defendant, Collins, and the female were "regulars" at the bar, and he had seen them before. In light of the manager's lengthy interaction with defendant shown on People's Exhibits 1 and 2, and his previous familiarity with defendant, trial counsel may have reasonably assessed that an eyewitness identification expert would not have assisted the defense.

Defendant's sole authority, *People v. McDonald* (1984) 37 Cal.3d 351, overruled on other grounds in *People v. Mendoza* (2000) 23 Cal.4th 896, is inapposite, as it addressed expert testimony on eyewitness identification in the context of a " 'conviction[] based solely on testimony that identifies a defendant previously unknown to the witness … [and] unsupported by corroborating evidence.' " (*McDonald*, at p. 363.) Here, defendant was not previously unknown to the manager, and defendant's identification as the shooter is corroborated by extensive video footage both before and after the shooting. Notwithstanding the reluctance of the manager and others to testify, the prosecution's case was strong and belies any mistaken identification. (After receiving testimony from the civilian witnesses, the court found a "sufficient basis to conclude that [one of the witnesses], as well as other witnesses, are willfully failing to remember some of the[ir] prior statement[s].[]) Even if an expert on cross-racial identification had been called, we see no reasonable probability of a result more favorable to defendant. No Sixth Amendment or due process violation is shown on this record.[]

(ECF No. 28-9 at 113-16.)

   3.   Standard for Sixth Amendment Claim of Ineffective Assistance of Counsel

To prevail on a Sixth Amendment ineffective assistance of counsel claim, a federal habeas petitioner must establish, first, that counsel's performance "fell below an objective standard of reasonableness" under prevailing professional norms. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). "Judicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. "The burden of rebutting this presumption rests squarely on the defendant, and it should go without saying that the absence of evidence cannot overcome it." *Dunn v. Reeves*, 594 U.S. 731, 738 (2021) (per curiam). On habeas review, moreover, a federal court is "doubly deferential" insofar as it takes "a highly deferential look at counsel's performance through the deferential lens of § 2254(d)." *Cullen v. Pinholster*, 563 U.S.

170, 190 (2011) (internal quotation marks and citations omitted).

Second, a petitioner must establish prejudice by showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial." *Strickland*, 466 U.S. at 694. When the defendant is challenging his conviction, the appropriate question is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Hinton v. Alabama*, 571 U.S. 263, 275 (2014) (internal quotation marks and citation omitted).

4. <u>Analysis</u>

Petitioner has not pointed to, nor is the Court aware of, a United States Supreme Court decision that either reached a "conclusion opposite" to the state courts' decision on the instant claim "on a question of law," or decided the "case differently . . . on a set of materially indistinguishable facts." *See Williams*, 529 U.S. at 412-13. Consequently, the state courts' denial of this claim was not "contrary to . . . clearly established" federal law, as defined by the holdings of the United States Supreme Court, within the meaning of 28 U.S.C. § 2254(d)(1).

The state courts' decision also did not "involve[] an unreasonable application of[] clearly established" federal law under 28 U.S.C. § 2254(d)(1). In its analysis of Petitioner's claim, the California Court of Appeal cited *Strickland*'s two-part, deficient-performance/prejudice test for ineffective assistance of counsel. (ECF No. 28-9 at 114.) And, as noted above, the other case law relied upon by the California Court of Appeal (*see id.*), mirrors the language and holdings of *Strickland* and its progeny regarding the principles for analyzing ineffective assistance of counsel claims. Consequently, the California Court of Appeal "identifie[d] the correct governing legal principle[s]" of federal law in analyzing Petitioner's claim of ineffective assistance of counsel. *See Williams*, 529 U.S. at 413.

The California Court of Appeal also reasonably applied these principles in analyzing Petitioner's ineffective assistance of counsel claim. Petitioner argues trial counsel should have presented testimony by an expert witness on identification because the manager's identification of

1   him as the shooter was unreliable.[4]  (*See* ECF No. 19 at 5-7.)  Petitioner asserts the manager "was

2   distracted by a variety of side tasks" over the course of his shift at the bar on the evening of the

3   shooting, "such as talking to different people in the bar," playing the lottery, and talking on the

4   phone "while the fighting took place," and "admitt[ed]" he had not seen the victim arguing or

5   fighting prior to the shooting.  (*Id.* at 5-6.)  In addition, Petitioner argues:

6               in the little time he had between figuring out what was wrong [w]ith
                the bloody man and hearing the first gunshot, [the manager] did not
7               have the opportunity to identify and remember the facial features of
                the shooter because he was more focused on escaping the active
8               gunfire.

9   (*Id.* at 6.)

10          The state court reasonably determined trial counsel's failure to present testimony by an

11   identification expert did not fall "below an objective standard of reasonableness" under *Strickland*,

12   466 U.S. at 688.  The state court reasonably rejected Petitioner's argument the evidence showed

13   the manager's identification of Petitioner as the shooter was unreliable.  The evidence presented at

14   trial reasonably supported the state court's factual determination that the manager was very

15   familiar with Petitioner prior to the shooting.  *See* 28 U.S.C. § 2254(d)(2).  The state court

16   correctly indicated the manager testified Petitioner had been a "regular" at the bar (ECF No. 34-2

17   at 50-51), and the surveillance videos show the manager sitting, drinking, and conversing with a

18   man whom he identified as Petitioner for 14 minutes earlier in the evening of the shooting.  (*See*

19   *id.* at 60; ECF No. 31 (People's Exhibits 1-2).)  The manager's familiarity with Petitioner meant

20   when he identified Petitioner as the shooter, it was based on knowing what Petitioner looked like

21   from previous encounters, and not simply a brief moment between the shooting and when the

22   manager ran out of the restaurant.  In addition, the manager did not only see the shooting live; as

23   noted by the state court, the prosecutor showed the manager the surveillance video of the shooting

24   both during the investigation and at trial and paused it on an image of the shooter.  (ECF No. 28-9

25   at 115; ECF No. 34-2 at 59-60; *see also* ECF No. 31 (People's Exhibit 3)[5].)  This showing gave

26

27   [4] Petitioner identifies the manager by name (ECF No. 19 at 5-7), but this Court follows the
     California Court of Appeal in not doing so in the interests of protecting his privacy (*see* ECF No.
     28-9; *id* at n.3).
28   [5] The video of the shooting shows the shooter's face.  (ECF No. 31 (People's Exhibit 3).)

United States District Court
Northern District of California

United States District Court
Northern District of California

the manager even more time to observe the shooter. This evidence, along with the manager's prior familiarity with Petitioner, supported a reasonable assessment by trial counsel that the manager's identification of Petitioner as the shooter was reliable, and, in turn, a reasonable assessment that an expert on eyewitness identifications would not have created a reasonable doubt about this identification or been an effective defense strategy. Consequently, the state court reasonably concluded trial counsel "may have reasonably assessed that an eyewitness identification expert would not have assisted the defense." (*See* ECF No. 28-9 at 115).

The state court also reasonably concluded there is no "reasonable probability" that the "result" of the trial would have been different if trial counsel had presented the testimony of such an expert. *See Strickland*, 466 U.S. at 694. To begin, Petitioner does not offer nor describe any testimony an identification expert would have provided, let alone any such testimony that would have assisted his defense. (ECF No. 19 at 5-7.)[6] Second, for the reasons discussed above—the manager's prior familiarity with Petitioner and his review of the surveillance video of the shooting—the manager's identification of Petitioner had strong indicia of reliability. Third, independent of the manager's identification, the surveillance video itself showing the shooter's face was additional evidence jurors could reasonably rely upon to find Petitioner was the shooter. Fourth, in closing argument trial counsel made the same arguments that Petitioner makes here as to why the manager's identification was not reliable: the manager was distracted, he ran out of the restaurant immediately after the shooting, and the other witnesses did not identify Petitioner. But these arguments did not give the jury reasonable doubt about Petitioner's guilt. (*See* ECF No. 34-4 at 73-74.) Under these circumstances, the state court reasonably concluded trial counsel's

---

[6] Although Petitioner attached a declaration by an identification expert with his *state court* habeas petitions (ECF No. 28-9 at 197-98; 245-248), he does not do so here. The Court notes, moreover, this expert did not express any opinion as to the strength of the manager's identification of Petitioner. (*Id.*) The expert described a variety factors that generally affect the accuracy of memory and identifications, such as lighting, hairstyles, elapsing of time, suggestive questioning or lineups, cross-racial identifications, and the emotional state and level of distraction of the identifier. (*Id.*) And after reviewing the papers in this case, he concluded only that "several of these issues are relevant and warrant further consideration." (*Id.* at 198, 248.) Therefore, even if this declaration was offered in support of the instant petition, it would not alter this Court's conclusion that the California Court of Appeal reasonably concluded there was no reasonable probability trial counsel's failure to call an eyewitness identification expert affected the outcome of the trial.

failure to present an expert on eyewitness identification did not prejudice Petitioner because there was no "reasonable probability" it affected the outcome of the trial. *Strickland*, 466 U.S. at 694.

*        *        *

The state courts' denial of Petitioner's Sixth Amendment claim of ineffective assistance of counsel, based upon counsel's failure to present the testimony of an eyewitness identification expert, was neither "contrary to" nor an "unreasonable application" of "clearly established" federal law, nor did it in involve an "unreasonable determination of the facts" within the meaning of 28 U.S.C. § 2254(d). Accordingly, Petitioner is not entitled to habeas relief on this claim.

**CONCLUSION**

For the reasons discussed above, the petition for a writ of habeas corpus is DENIED. Moreover, a certificate of appealability will not be issued, *see* 28 U.S.C. § 2253(c)(1)(A), because no reasonable jurist would find the Court's denial of Petitioner's second claim on its merits, nor the prior dismissal of his other claims on procedural grounds (ECF No. 26), "debatable or wrong." *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000).

The Clerk shall enter judgment and close the file.

**IT IS SO ORDERED.**

Dated: June 20, 2025

JACQUELINE SCOTT CORLEY
United States District Judge